COURT OF APPEALS OF VIRGINIA

Present: Judges Russell, AtLee and Senior Judge Haley


CAROLE ANNE FILYAW

MEMORANDUM OPINION*
v.      Record No. 0113-21-1                                    PER CURIAM
                                                                AUGUST 10, 2021
CITY OF VIRGINIA BEACH
  DEPARTMENT OF HUMAN SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
A. Bonwill Shockley, Judge

(Margaret B. McNamara; Cordell & Cordell, on brief), for appellant.
Appellant submitting on brief.

(Mark D. Stiles, City Attorney; Christopher S. Boynton, Deputy City
Attorney; Elena E. Ilardi, Associate City Attorney; Edrie Pfeiffer,
Guardian *ad litem* for the minor child; Hampton Roads Legal
Services, on brief), for appellee. Appellee and Guardian *ad litem*
submitting on brief.


Carole Anne Filyaw (mother) appeals the circuit court's order terminating her parental rights

and approving the foster care goal of adoption. Mother argues that the circuit court erred by finding

that the evidence was sufficient to terminate her parental rights under Code § 16.1-283(B) and

(C)(2).[1] She further asserts that the circuit court erred by terminating her parental rights under Code

§ 16.1-283(C)(2) "without making a determination that [she] received adequate rehabilitative

services" while her child was in foster care. Lastly, mother contends that the circuit court violated

her due process rights. Upon reviewing the record and briefs of the parties, we conclude that the

circuit court did not err. Accordingly, we affirm the decision of the circuit court.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The record demonstrates, however, that the circuit court relied only on Code
§ 16.1-283(C)(2).

BACKGROUND[2]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cnty. Dep't of Hum. Servs., 63 Va. App. 157, 168 (2014)).

In February 2018, mother and the then-five-year-old child who is the subject of this appeal, were living in a home with mother's roommate and Donald Roberts, the roommate's boyfriend. Roberts was a registered sex offender. Mother was aware of Roberts's status but nevertheless allowed him to babysit the child occasionally.

On Thursday, February 22, 2018, as mother walked down her home's hallway, she saw the child and Roberts quickly pull up their pants in the kitchen. Mother watched the child run to the bathroom and spit something out; mother heard the child say it was "nasty." Mother did not confront Roberts or the child. Rather, she asked Roberts to watch the child that Saturday following the incident, while she ran an errand.

The next day, Sunday, February 25, 2018, mother asked the child what had happened and whether Roberts had done anything. The child reported that Roberts had "licked her kitty." Mother took the child to the emergency room. At the hospital, the child reported that Roberts

---

[2] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

had sexually assaulted her "multiple times."[3]  Mother changed the locks to the home and told Roberts and her roommate that they had to leave.

The City of Virginia Beach Department of Human Services (the Department) became involved upon learning that the child had been sexually assaulted.  The Department was concerned that mother had left the child in Roberts's care despite knowing that Roberts was a sex offender and she had seen them in the kitchen with their pants down.  The Department also discovered that mother was actively engaged in prostitution and used marijuana.

On March 1, 2018, the Department removed the child from mother's home.  The City of Virginia Beach Juvenile and Domestic Relations District Court (the JDR court) entered emergency and preliminary removal orders.  The JDR court adjudicated that the child was abused or neglected and entered a dispositional order.

The Department reviewed with mother the requirements she had to meet to be reunified with the child.  The Department required mother to obtain and maintain stable housing.  The Department also required mother to find new employment, other than escorting.  Mother maintained several jobs throughout the matter, but the Department's review of her bank accounts suggested that she had continued escorting.

The Department required mother to participate in a psychological and parent capacity evaluation and follow through with all recommendations.  On July 27, 2018, the psychologist prepared a report and diagnosed mother with bipolar disorder, post-traumatic stress disorder, borderline personality disorder, and cannabis use disorder, moderate.  The psychologist found that mother's escorting services had placed her and the child "at risk of harm."  Furthermore, the

---

[3] Roberts pleaded guilty to two counts of aggravated sexual battery with a victim younger than thirteen years old, one count of custodial indecent liberties, and one count of probation violation.  The circuit court convicted Roberts and sentenced him to a total of thirty-seven years and eight months in prison, with twenty-five years and eight months suspended.

psychologist questioned mother's judgment and was concerned about her lack of stability. The psychologist recommended that mother participate in outpatient mental health treatment and medication management. The psychologist also recommended that a parenting coach work with mother on understanding "how her strong needs for attention and affection are inappropriately placed on her daughter."

The psychologist opined that mother needed to "improve her mood and functioning and display an understanding of how her interactions with her child have impacted her child and could further cause emotional harm to the child." In addition, the psychologist recommended that mother work with a mental health support worker to "help her develop stability in her ongoing mental health functioning and in her daily life." Lastly, the psychologist suggested that mother be referred for a substance abuse evaluation and submit to random drug screens.

The Department referred mother to parenting classes and required that she participate in counseling and medication management. Mother completed the parenting classes and engaged in counseling. The Department also referred mother to substance abuse treatment, and while she completed the evaluation, she was discharged from the program due to poor attendance and a positive drug screen.

In addition, the Department arranged for a private agency called Family Systems to assist mother with anger management, mental health support, parent coaching, and case management. Mother told the worker with Family Systems that she was "traumatized" when she saw the child being abused; however, mother never understood her role in the child's circumstances. Mother believed that the situation was not her "fault" because she did not do anything to the child. Mother acknowledged that she had engaged in prostitution, and although she was provided with information about "different financial streams of employment," she continued to prostitute.

Mother stopped working with Family Systems in March 2019 after stating that she "no longer wanted to participate in the services."

The Department arranged for supervised visitation between mother and the child. At one visit, mother gave the child a backpack, inside of which she hid a watch with GPS and telephone capability. The foster parents discovered the watch when it rang at midnight. When the Department asked mother about the watch, mother became "[v]ery irate." The Department learned of other incidents in which mother had tried to call the foster parents' home or follow the child to the foster parents' home, and when questioned about those incidents, mother was not cooperative. At one meeting with the social worker, mother "started to yell, scream, and just stomp her feet." At another family partnership meeting, mother "yelled and stormed out of the room and was asked by the facilitator of the meeting not to come back into the building because she was so volatile at the time and irate and yelling."

The Department suspended the visits for a few months because of mother's reactions at the end of the visits. Mother's contact with the child resumed when she started attending family therapy sessions with the child and the child's therapist. Initially, mother was "appropriate" during the sessions. The child's therapist found mother to be "very emotionally driven[,]" however, "needing that support from her child." Consequently, in January 2019, the child's therapist asked mother not to attend the sessions for a while, as the child was adjusting to a new foster home and school and having some behavioral challenges, such as stealing. Mother became "very emotionally distraught." After being told that the sessions were suspended, mother began calling the child's therapist as often as twenty to thirty times a day and "became very threatening."

In June 2019, the JDR court approved the foster care plan with the goal of adoption and relative placement. Mother informed the JDR court that she had stopped prostituting two weeks

before the hearing. Mother claimed that she been diagnosed as a sex addict and completed an online prostitution prevention course to help her. Mother reported to the Department that she knew that she needed sex addiction treatment but was uncomfortable in a group setting. The Department asked her to provide a written diagnosis and recommendation, and it would help her find treatment.

In July 2019, the Department was willing to "find some way" for mother to have contact with the child. Supervised visitations resumed in the summer of 2019. The Department advised mother of its requirements for reunification, including providing copies of her monthly bank statements, her lease, her therapists' assessments and treatment plans, her medication management appointments, attendance records at Narcotics Anonymous meetings, and her drug screen results.[4] The Department only received documentation showing that mother's drug screen was negative for illegal substances, not the other requested information.

Meanwhile, the Department explored the maternal grandparents, who lived in South Carolina, as a potential relative placement for the child. The maternal grandparents visited the child and had telephone contact with her. At the same time, the child's behaviors were "up and down." The foster mother encouraged the Department to place the child with the maternal grandparents because she having difficulty managing the child's behaviors.

In December 2019, the JDR court approved the foster care goal of adoption, with a concurrent goal of relative placement. The JDR court also granted the Department's request to place the child with the maternal grandparents, over mother's objections. Mother appealed the JDR court's ruling, but the circuit court dismissed her appeal when she did not appear for the hearing.

---

[4] The Department requested mother's bank statements to verify that she had income unrelated to prostitution.

When the child was placed with the maternal grandparents in South Carolina, mother also moved to South Carolina. Mother had supervised visits with the child in South Carolina.[5]

In May 2020, the child returned to Virginia because the maternal grandparents "couldn't handle" the child's behaviors. The Department decided to allow the child to adjust to her foster home and resume therapy before scheduling visitation with mother. The Department asked the child's therapist to determine "when it would be appropriate to incorporate" mother into the child's life.

On September 1, 2020, the JDR court approved the foster care plan with the goal of adoption. The JDR court also dismissed the Department's petition to terminate mother's parental rights, at the Department's request. Both the Department and mother appealed the JDR court's rulings to the circuit court.

At that time, the child was doing well in her foster home, but her behavior deteriorated after she started school and had contact with her mother. The child's therapist had resumed family therapy sessions with mother and the child. The child's therapist reiterated to mother repeatedly that she was not facilitating visitations, but "therapeutic services, family therapy for [mother] and her daughter." Then, the child's "behavior started to just go downhill with lying, stealing, being disrespectful, using profanity, running out . . . of the foster parents' home with no shirt on, trying to run away." The child's therapist ended the family therapy because of the child's behavioral "difficulties" and the discovery that mother had had unapproved contact with the child outside of therapy. Mother then started sending threatening emails to the child's therapist.

On January 6 and 11, 2021, the parties appeared before the circuit court. The Department reported that mother had not completed her individual therapy, medication management, and

---

[5] Mother paid for the services of the visitation supervisor.

substance abuse treatment. Mother had not provided the Department with her current bank statements, verification of her lawful employment, and current treatment plans. The Department remained concerned that mother had "not committed to the treatment that's been needed to address the sex addiction, the risk that comes along with that, and protecting her daughter and her mental health treatment."

The child's therapist testified that the child needed "intense therapy" and would benefit from in-home services. The child's therapist further opined that contact between mother and the child was "a trigger" for the child and was not "conducive" to the child's growth.

After the Department presented its evidence, mother moved to strike; the circuit court denied the motion. Mother testified that she had moved to South Carolina and that she had a bedroom for the child in her new home. Mother admitted that she had held many different jobs while the child was in foster care. She acknowledged that she was advised to stop engaging in prostitution in April 2018, but she had continued doing so until January 2020.[6] She anticipated starting a new job at a grocery store after the circuit court hearing.

Mother testified that she had continuously seen her therapist and provided documentation confirming her attendance. Mother also testified that in the summer of 2020, she was evaluated and attended three therapy sessions for her sex addiction. Mother was unable to afford additional sessions, but she found another potential therapist and had an appointment after the circuit court hearing.

Mother emphasized that she had completed the required parenting class, substance abuse treatment, anger management class, and the prostitution prevention class. Mother admitted that

---

[6] Mother admitted that she had engaged in prostitution after she told the JDR court that she had stopped.

she had "messed up," but asked for a "second chance." Mother promised to "do anything and everything to get [her] daughter back."

At the conclusion of all the evidence, mother renewed her motion to strike. After hearing the parties' arguments, the circuit court found that mother had not substantially remedied the conditions that led to the child's placement and continuation in foster care and approved the foster care goal of adoption. On January 11, 2021, the circuit court entered an order terminating mother's parental rights under Code § 16.1-283(C)(2). This appeal followed.

## ANALYSIS

### Termination of parental rights

Mother challenges the circuit court's ruling terminating her parental rights under both Code § 16.1-283(B) and Code § 16.1-283(C)(2). The record established that the circuit court terminated mother's parental rights only under Code § 16.1-283(C)(2). Therefore, we do not address mother's arguments regarding the sufficiency of the evidence to terminate under Code § 16.1-283(B). "Because the record does not show that the trial court ruled on appellant's argument, there is no ruling of the trial court for this Court to review on appeal." Duva v. Duva, 55 Va. App. 286, 299 (2009).

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cnty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

Mother argues that the evidence was insufficient to support the termination and that the Department failed to provide her with "adequate rehabilitative services." Code § 16.1-283(C)(2) states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Yafi, 69 Va. App. at 552 (quoting Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005)).

Mother claims that the Department did not provide her with "appropriate services" after the child moved to South Carolina. She stresses that she had continued therapy and sought additional treatment for her sex addiction.

"'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Harrison v. Tazewell Cnty. Dep't of Soc. Servs., 42 Va. App. 149, 163 (2004) (quoting Ferguson v. Stafford Cnty. Dep't of Soc. Servs., 14 Va. App. 333, 338 (1992)). The Department "is not required to force its services upon an unwilling or disinterested parent." Tackett v. Arlington Cnty. Dep't of Hum. Servs., 62 Va. App. 296, 323 (2013) (quoting Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 243 (1982)); see also Logan, 13 Va. App. at 130.

Throughout the time that the child was in foster care, the Department provided numerous services to mother, including referrals for a psychological and parenting evaluation, substance

abuse treatment, counseling, parenting classes, and Family System services. Mother completed the psychological and parenting evaluation, the substance abuse treatment, and parenting classes. Mother, however, stopped participating in the services with Family System, which was providing her with parent coaching and mental health support services. Mother also had opportunities to engage in family therapy sessions with the child. When the child's therapist suspended the sessions because of the child's declining behaviors, mother made threatening calls and sent threatening emails.

The circuit court found that mother had "tried to do some things, at other points in time it look[ed] like [she had not] quite done the things that she needed to do." The circuit court found that mother had "an unstable work history." The circuit court emphasized that mother admitted that she had continued engaging in prostitution as recently as January 2020. Mother also had not completed the treatment for her sex addiction. The child had been in foster care for almost three years, and the circuit court concluded that after all that time, mother's circumstances "didn't change sufficiently."

At the time of the circuit court hearing, mother still was unable to properly care for the child. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett, 62 Va. App. at 322 (quoting Kaywood v. Halifax Cnty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Considering the totality of the record, the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(C)(2).

Due process

Mother argues that the circuit court's ruling violated her due process rights because "the Department failed to provide [her] with adequate rehabilitative services while her child was in"

the Department's custody. Mother claims that the "Department failed to provide services and set clear goals for [her] in this case in violation of the requirements set forth in [Code] § 16.1-283." She further asserts that "[f]airness requires a clear understanding of how a reunification may be accomplished."

Assuming without deciding that mother preserved her constitutional argument for appeal, this Court finds that the circuit court did not violate mother's due process rights. "Due process requires that 'fundamentally fair procedures' be employed in parental termination cases." Toms, 46 Va. App. at 274 (quoting Santosky v. Kramer, 455 U.S. 745, 754 (1982)). "In view of the parental interest at stake in these proceedings, 'due process requires the trial courts to comply strictly with the statutory scheme for disposition of child custody cases.'" Strong v. Hampton Dep't of Soc. Servs., 45 Va. App. 317, 321 (2005) (quoting Rader v. Montgomery Cnty. Dep't of Soc. Servs., 5 Va. App. 523, 528 (1988)). "[T]he requirement 'to comply strictly with the statutory scheme' guarantees proper notice is given to the parents before the irreversible disposition of terminating parental rights occurs." Id. at 322 (quoting Rader, 5 Va. App. at 528). Moreover, "[i]t is implicit in the statutory scheme . . . that the natural parent, at subsequent hearings concerning that child, is entitled to prior and specific notice of the disposition sought by the agency in whose custody a child has been placed." Id. at 321 (quoting Martin, 3 Va. App. at 22).

The record proves that mother had notice of and participated in the JDR court and circuit court proceedings, as well as family partnership meetings, visitations, and family therapy sessions. The Department submitted foster care plans that included the foster care goals, as well as the expectations the Department had for mother. The Department also sent mother two letters in the fall of 2019 advising her of the foster care goals and the requirements she had to meet before she could be reunified with her child. Mother knew what was required of her and had the

opportunity to engage in the services, but she chose not to fully participate and complete all of the Department's requirements. Accordingly, mother's due process rights were not violated.

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

<u>Affirmed.</u>